UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| DEBORAH RINEHART,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | 3:18-CV-03003-RAL<br><br>OPINION AND ORDER AFFIRMING DECISION OF COMMISSIONER |

Plaintiff Deborah Rinehart (Rinehart) seeks reversal of the decision of the Commissioner of Social Security (Commissioner) denying Rinehart widow's insurance benefits. Doc. 14. The Commissioner argues for this Court to affirm the denial of benefits. Doc. 16. For the reasons explained below, this Court affirms the Commissioner's decision.

I. **Summary of Case**

A. **Procedural History**

On May 14, 2012, Rinehart filed an application for Social Security widow's insurance benefits. Doc. 12 at 55–61. The Commissioner denied Rinehart's claim initially on June 4, 2012, on the basis that Rinehart was not married to Richard Harter (Harter) for at least nine months before the date of his death as required by the Social Security Act (Act). Doc. 12 at 65. On August 2, 2012, Rinehart requested reconsideration of her claim. Doc. 12 at 68–69. Upon reconsideration, the claim was denied. Doc. 12 at 70–73.

1

Rinehart then sought a hearing before an Administrative Law Judge (ALJ), which was conducted on July 26, 2013.[1] Doc. 12 at 74, 107. At the hearing, Rinehart proceeded pro se. Doc. 12 at 110. On August 14, 2013, the ALJ issued his opinion denying Rinehart's claim for widow's insurance benefits. Doc. 12 at 107–10. The ALJ considered statements from Rinehart that Harter was healthy on the date of their marriage on August 27, 2011, and was expected to live for many years. Doc. 12 at 29, 109. The ALJ also considered Dr. Vinod Parameswaran's (Dr. Parameswaran) prediction that Harter had a median survival rate of 3.3 years from January 2012 when Dr. Parameswaran had begun his care for Harter's blood cancer. Doc. 12 at 29, 109. However, the ALJ concluded that Rinehart was not entitled to widow's benefits because Harter's death did not meet the definition of "accidental" in the Code of Federal Regulations (regulations). Doc. 12 at 29, 109. The ALJ Judge reasoned that "[n]o evidence has been submitted that definitively establishes that the insured's blood cancer did not cause or contribute to his death" to support a conclusion that his death was an "accident." Doc. 12 at 27, 109.

Rinehart hired an attorney, Doc. 12 at 127, who appealed to the Appeals Council and submitted new material, Doc. 12 at 114–322; Doc. 12-1 at 1–25. The new material included an affidavit, medical evidence, a summary of the evidence, and a brief. Doc. 12 at 115–322; Doc. 12-1 at 1–25. The Appeals Council remanded the case to the ALJ to determine whether the preexisting condition was the proximate cause of the wage earner's death or whether his death satisfies the statutory requirements of an accidental death which would entitle Rinehart to widow's insurance benefits. Doc. 12-1 at 31.

---

[1] The first ALJ in Rinehart's case was Robert Maxwell and the hearing was held in Huron, South Dakota. Doc. 12 at 107.

Rinehart provided additional evidence for the second ALJ[2] to consider on remand. Doc. 12 at 15. Before the hearing, Rinehart submitted an expert opinion from Ronald Citron, M.D (Dr. Citron). Doc. 12-1 at 77–88. After the hearing was held on June 23, 2015, Dr. Parameswaran submitted responses to interrogatories, and counsel made written argument. Doc. 12-1 at 94–98, 107–08, 112–26. On September 14, 2015, the ALJ held that Rinehart's marriage to Harter did not satisfy the nine-month durational marriage requirement and that no exception, including the accidental death exception, applied. Doc. 12 at 17. Rinehart was thus denied benefits. Doc. 12 at 19.

Rinehart appealed the second ALJ decision to the Appeals Council. Doc. 12 at 7. On January 30, 2018, the Appeals Council affirmed. Doc. 12 at 7–9. The Appeals Council considered Rinehart's argument against the ALJ's decision, and stated "[w]e found that the reasons do not provide a basis for changing the Administrative Law Judge's decision." Doc. 12 at 7. By denying Rinehart's request for review, the decision of the ALJ became the final decision of the Commissioner. Doc. 12 at 7.

Rinehart filed a Complaint in this Court appealing the Commissioner's final decision. Rinehart contends that the Commissioner's decision denying her benefits is not based upon substantial evidence and that substantial evidence shows she is entitled to widow's insurance benefits. Rinehart seeks reversal of the Commissioner's decision.

### B. Relevant Facts

The second ALJ properly observed that "[t]he facts of this matter are largely undisputed" and that Rinehart's "credibility is not at issue." Doc. 12 at 16–17. Harter and Rinehart met in

---

[2] The ALJ on remand was Hallie E. Larsen and a video hearing was held with Rinehart appearing from Huron, South Dakota, and the ALJ appearing from Fargo, North Dakota. Doc. 12 at 19.

3

2002 in Highmore, South Dakota. Doc. 12 at 45–46. Rinehart had a real estate business and was hired by Harter to sell some property. Doc. 12 at 37–38. During the course of this business relationship, Rinehart and Harter developed a close friendship. Doc. 12 at 39. They became a couple and eventually got engaged. Doc. 12 at 41, 45. On August 27, 2011, Rinehart and Harter were married in Highmore. Doc. 12 at 58, 116. The marriage was not a sham; Rinehart and Harter had a loving and close relationship for a prolonged period of time leading up to the wedding. Doc. 12 at 39–47.

About a month before the wedding, Harter woke up with petechiae[3] all over his body. Doc. 12 at 115, 204, 312. He visited his family physician in Miller, South Dakota, who found that Harter had a very low blood platelet count. Doc. 12 at 115–16, 312. Harter was referred to Michael McHale, M.D. (Dr. McHale), a hematologist/oncologist in Sioux Falls, South Dakota. Doc. 12 at 116, 312. On August 2, 2011, Harter saw Dr. McHale for his idiopathic thrombocytopenic purpura (ITP).[4] Doc. 12 at 116, 312. Dr. McHale ordered a bone marrow biopsy. Doc. 12 at 116, 307. On August 5, 2011, a pathologist reported that the bone marrow biopsy results were not typical of ITP, but of myeloproliferative neoplasm[5] blood cancer and most likely of a type of leukemia called

---

[3] Petechiae are red, purple, or brown spots that appear on the skin that commonly appear in clusters. See Petechiae, Mayo Clinic, https://www.mayoclinic.org/symptoms/petechiae/basics/definition/sym-20050724 (last updated Apr. 17, 2018).

[4] ITP is now known as "Immune Thrombocytopenia," which is a disorder that causes excessive bruising and superficial bleeding into the skin. Immune Thrombocytopenia (ITP), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/idiopathic-thrombocytopenic-purpura/symptoms-causes/syc-20352325 (last visited May 8, 2019).

[5] Myeloproliferative neoplasms is a type of blood cancer. Polycythemia Vera, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/polycythemia-vera/symptoms-causes/syc-20355850 (last visited May 8, 2019).

primary myelofibrosis.[6] Doc. 12 at 303. Harter was prescribed Prednisone.[7] Doc. 12 at 157, 296, 313.

In September 2011, Prednisone had not succeeded in increasing Harter's platelet count, so Dr. McHale prescribed Rituximab.[8] Doc. 12 at 116, 158. On Rituximab, Harter experienced a skin reaction without improvement of his platelet counts. Doc. 12 at 116, 296. On September 13, 2011, Harter returned to Dr. McHale. Doc. 12 at 294. Dr. McHale's impression was, again, ITP and questioned whether there was myelofibrosis leukemia. Doc. 12 at 294, 296. Dr. McHale subsequently prescribed WinRho,[9] but Harter experienced a severe reaction to WinRho and stopped taking it. Doc. 12 at 117, 296.

In October of 2011, Harter and Rinehart visited the Mayo Clinic. Doc. 12 at 117, 159. Harter was seen by specialists, including Dr. Robert Phyliky, hematologist, and Dr. Ayalew Tefferi (Dr. Tefferi), a specialist in proliferative disorders of hematic cells. Doc. 12 at 117–18, 165, 206, 215. The physicians diagnosed chronic myeloproliferative neoplasm with dysplastic features. Doc. 12 at 206, 215. Harter was placed on Danazol[10] for long-term treatment. Doc. 12 at 215.

---

[6] Myelofibrosis is a bone marrow disorder that disrupts a person's normal production of blood cells and is an uncommon type of chronic leukemia. Myelofibrosis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myelofibrosis/symptoms-causes/syc-20355057 (last visited May 7, 2019).

[7] Prednisone is used to treat a number of different conditions, including blood and bone marrow problems. Prednisone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/description/drg-20075269 (last updated Apr. 1, 2019).

[8] Rituximab is used to treat many conditions, including non-Hodgkin's lymphoma and chronic lymphocytic leukemia, by helping the immune system destroy cancer cells. Rituximab (Intravenous Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/rituximab-intravenous-route/description/drg-20068057 (last visited May 28, 2019).

[9] WinRho is a brand name of Rho(D) immune globulin, which is a medicine used to treat ITP. Rho(D) Immune Globulin (Injection Route, Intramuscular Route, Intravenous Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/rhod-immune-globulin-injection-route-intramuscular-route-intravenous-route/description/drg-20065796 (last visited May 28, 2019).

[10] Danazol is used to treat numerous conditions, including endometriosis, fibrocystic breast disease, and "hereditary angioedema which is the "swelling of the different parts of the body, such

Dr. Tefferi advised Harter to connect with a hematologist close to Highmore to have access to blood and platelets for transfusions in case of bleeding. Doc. 12 at 118, 166, 221–22.

On January 6, 2012, Harter met with Christina Gant (Gant), oncology certified nurse practitioner at St. Mary's Hospital in Pierre. Doc. 12 at 166, 312. She set up a telemedicine conference with Dr. Parameswaran. Doc. 12 at 118, 167, 312. On January 18, 2012, Gant acted as a scribe for Dr. Parameswaran, by recording:

> [H]e agreed with the Mayo Clinic doctors that myeloproliferative neoplasm is incurable. However, there is some talk that sometimes it can be treated as [myelodysplastic syndrome (MDS)],[11] especially if the patient has dysplastic features within his bone marrow which this patient looked as though he did. Dr. [Parameswaran] also [wanted to] to repeat a bone marrow biopsy to check for leukemia and to see if acute leukemia is present. If the patient is more MDS than MPD [myeloproliferative disorder], Dr. [Parameswaran] discussed with him that he could possibly be started on Vidaza[12] . . . .

Doc. 12 at 314.

Dr. Parameswaran ordered another bone marrow biopsy and peripheral blood test on January 23, 2012. Doc. 12 at 285–88. A pathologist deemed the results consistent with MDS, best classified as refractory anemia with excess of blasts (RAEB-1)[13] or acute myeloid leukemia. Doc. 12 at 169, 288. A Seattle laboratory performed additional studies. Doc. 12 at 290. On January 26, 2012, Dr. Parameswaran reported his diagnosis as MDS RAEB-1. Doc. 12 at 192. He

---

as abdomen or stomach, arms, legs, throat, skin, or sexual organs." Danazol (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/danazol-oral-route/description/drg-20067988 (last updated Feb. 1, 2019).

[11] MDS are a group of disorders caused by poorly formed blood cells which increases the risk of cancer. Myelodysplastic Syndrome, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myelodysplastic-syndrome/symptoms-causes/syc-20366977 (last visited May 28, 2019).

[12] Vidaza is a type of chemotherapy. Doc. 12-1 at 81.

[13] MDS RAEB-1 is a condition where a person has abnormal red blood cells, white blood cells, or platelets. Myelodysplastic Syndrome, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myelodysplastic-syndrome/symptoms-causes/syc-20366977 (last visited May 28, 2019).

reviewed the laboratory results through a telemedicine conference with Harter. Dr. Parameswaran recorded:

> I have discussed the diagnosis and prognosis with him in detail. I have indicated that his median survival is in the order of three to five years at this stage of disease with the 25% AML [acute myeloid leukemia] progression in the absence of therapy at a median of 3.3 years . . . . Clearly, he can continue his danazol and his platelet stabilized then we can back off on danazol. I have recommended azacytidine which I will be prescribing at a dose of 75 mg/m2 IV daily for seven days repeated every month. The side effects of the drug were discussed in detail. I have told him that his disease will progress to leukemia if it is untreated. I have informed him that it may take several weeks to months for the drug to work and his counts may deteriorate in the meanwhile . . . . We will consult Dr. Becker to have a central venous catheter, Port-a-Cath placed . . . . He will start therapy this coming Monday. We will give him six units of platelets prior to placement.

Doc. 12 at 192.

After the appointment, Harter researched Vidaza and wrote questions to ask Dr. Parameswaran. Doc. 12 at 315–18. Gant faxed Dr. Parameswaran that Harter had his port placed but "now doesn't know if he wants chemo. He has been researching and doesn't know if it is the best thing for him right now . . . ." Doc. 12 at 318. Dr. Parameswaran, on February 27, 2012, had a telemedicine visit with Harter, for which the notes state:

> His next question was could the treatment leave him permanently worse off than he was originally. Dr. [Parameswaran] stated that no, the disease process may progress and that may leave him in a worse state than he was originally but the Vidaza will not leave his counts permanently damaged . . . . The next question was were there real benefits for starting the treatment now rather than waiting and watching to see how the disease develops. Dr. [Parameswaran] stated that yes, if the disease is caught prior to it becoming acute myelocytic leukemia, there are definite benefits in the form of greatly increased life expectancy of greater than 10 years as opposed to if he should develop acute myelocytic leukemia a life expectancy of 4 months to a year.

Doc. 12 at 319.

Harter underwent infusions of Vidaza in Pierre from March 5 to March 13, 2012. Doc. 12-1 at 7. On March 18, 2012, Harter began shaking, sweating, and had a fever. Doc. 12-1 at 7. He went to the emergency room, was diagnosed with pneumonia/septicemia, and was admitted to the

7

hospital. Doc. 12 at 177; Doc. 12-1 at 7. Pneumonia with sepsis is a known side-effect of Vidaza. Doc. 12 at 175. The next day, Harter went into respiratory failure. Doc. 12-1 at 7.

On March 21, 2012, Harter was transferred to Avera McKennan Hospital in Sioux Falls for further evaluation and treatment. Doc. 12-1 at 7. His attending physician wrote in the discharge summary: "[d]espite all the efforts of multiple specialists including pulmonary, nephrology, infectious disease, hematology, oncology, patient unfortunately did not show improvement and rather deteriorated." Doc. 12-1 at 12. Diagnoses included septic shock and "immunosuppression secondary to MDS." Doc. 12-1 at 10.

Harter was transferred to hospice on April 17, where he died on April 20, 2012. Doc. 12-1 at 10–13, 43. The death certificate lists the manner of death as "natural causes" and the cause of death as respiratory and kidney failure, sepsis, pneumonia, MDS, and atrial fibrillation. Doc. 12-1 at 43.

According to Dr. Citron, Vidaza temporarily shuts down the production of blood cells including production of white blood cells that protect against infection. Doc. 12-1 at 81. Dr. Citron explained that five days after Harter's first cycle of chemotherapy, when blood cell production was suppressed from treatment with Vidaza, Harter contracted an infection called sepsis. Doc. 12-1 at 80–81. Dr. Citron also opined that "the administration of Vidaza was the initiating event in an unbroken chain of events each causing the next that led to and ultimately caused the death of Richard." Doc. 12-1 at 81. Dr. Parameswaran stated, "[a]fter the Vidaza his [white blood cell count] count dropped to serious levels . . . but recovered over 4-5 days. But this narrow window may have served as a portal to initiate the serious chain of events . . . ." Doc. 12-1 at 97.

C. **Final Administrative Decision**

8

On remand, the second ALJ issued a decision denying Rinehart's application for widow's insurance benefits. Doc. 12 at 16. In doing so, the ALJ used the evaluation process in 20 C.F.R. § 404.335(a) and the Social Security Administration's Program Operations Manual System (POMS). Doc. 12 at 15–19. The principal issue for the ALJ to determine was whether the accidental death exception to the nine-month marriage duration requirement applied. Doc. 12 at 15. For the accidental death exception to apply, the ALJ would have to answer the following two questions affirmatively: 1) whether the insured was reasonably expected to live for nine months at the time of the marriage, and 2) whether the death of the insured was an accident. Doc. 12 at 16 (citing 20 C.F.R. § 404.335(a)(2)(i)).

At the first step, the ALJ presumably concluded that Harter was reasonably expected to live for nine months on the date of the marriage by stating that the death and circumstances that led to Harter's death were "not expected." Doc. 12 at 18. Neither party contests this issue.

At the second step, the ALJ sought guidance from the regulations and the POMS to determine whether Harter's death was "accidental." Doc. 12 at 17. The ALJ determined that Harter's death was not independent of all other causes as defined by POMS to be considered an accidental death. Doc. 12 at 17. The ALJ further reasoned that "[w]hile not the intended or expected outcome, there was a chance such complications could occur" that resulted in Harter's death. Doc. 12 at 18. Having determined Harter's death not to be "accidental," the ALJ denied Rinehart widow's insurance benefits. Doc. 12 at 19. This became the Commissioner's final decision upon the Appeals Council affirming the decision. Doc. 12 at 7–9.

## II.  Standard of Review

When considering whether the Commissioner properly denied social security benefits, a court must "determine whether the decision is based on legal error, and whether the findings of

fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)); see also Nowling v. Colvin, 813 F.3d 1110, 1119–20 (8th Cir. 2016). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," and such errors are reviewed de novo. Collins, 648 F.3d at 871 (internal citations removed). A district court reviews the Commissioner's decision de novo for any legal errors and to determine if appropriate legal standards were applied. See Collins, 648 F.3d at 871; Robertson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007); Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994); see Nowling, 813 F.3d at 1119; Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence is more than a mere scintilla," Id. at 1154 (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also Nowling, 813 F.3d at 1119. It is that which "a reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord Nowling, 813 F.3d at 1119; Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). The "'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

A reviewing court must "consider evidence that supports the [Commissioner's] decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995); see also Nowling, 813 F.3d at 1119. In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the [Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision' of the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)); see also Chaney, 812 F.3d at 676. The court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." Miller, 784 F.3d at 477 (citing Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014)); see also Nowling, 813 F.3d at 1119.

### III. Legal Analysis

Section 202(e) of the Act provides for the payment of monthly benefits to the widow of an individual who dies fully insured. 42 U.S.C. § 402(e). There is no question that Harter died fully insured. The term "widow" is defined as "the surviving wife of an individual, but only if . . . she was married to him for a period of not less than nine months immediately prior to the day on which he died." 42 U.S.C. § 416(c)(5); see also 20 C.F.R. § 404.335(a)(2). Rinehart was married to Harter for about eight months prior to his death and concedes that she does not satisfy the Act's requirement of having been married to Harter for nine months. See 42 U.S.C. § 416(c)(1)(E).

However, the nine-month durational marriage requirement is deemed satisfied where the insured's death is "accidental." 42 U.S.C. § 416(k)(1)(A). The parties divide on this issue. Rinehart argues that Harter's death hastened by the sepsis following administration of Vidaza constitutes an "accidental death," which would entitle Rinehart to widow insurance benefits. See 42 U.S.C. § 416(k)(2)(B). For this exception to apply, (1) the insured individual must reasonably have been expected to live for nine months at the time of the marriage, and (2) the insured individual's death must have been accidental. 42 U.S.C. § 416(k)(1); 20 C.F.R. § 404.335(a)(2)(i).

The first requirement for the accidental death exception is that Harter was reasonably expected to live for nine months when the August 27, 2011, marriage occurred. Rinehart initially framed the first issue as whether Harter's life expectancy was greater than nine months at the time he received Vidaza chemotherapy, Doc. 15 at 15, but clarified later that she "agrees with Commissioner that the correct legal standard is Mr. Harter's life expectancy from date of marriage, not the date of his subsequent Vidaza chemotherapy," Doc. 17 at 2. The Commissioner acknowledges that Harter's life expectancy when he married Rinehart was at least nine months, and thus the first requirement is satisfied. Doc. 16 at 5. The record establishes that when Harter and Rinehart married, Harter's life expectancy, notwithstanding his recent diagnosis with a form of blood cancer, exceeded nine months. See Doc. 12 at 192.

The second requirement for the accidental death exception is that the insured individual's death be "accidental," which is defined by the statute as "bodily injuries solely through violent, external, and accidental means and, as a direct result of the bodily injuries and independently of all other causes, [the insured] loses his life not later than three months after the day on which he receives such bodily injuries." 42 U.S.C. § 416(k). The regulations provide an interpretation on the redundancy in the statute that defines "accidental death" in part as one by "accidental means."

See 42 U.S.C. § 416(k). Under the regulations, a death is accidental if (1) the death was "caused by an event that the insured did not expect," (2) the death was "the result of bodily injuries received from violent and external causes," and (3) "as a direct result of these injuries, death occurred not later than [three] months after the day on which the bodily injuries were received." 20 C.F.R. § 404.335(a)(2)(i).

The second ALJ relied principally on the POMS in determining whether Harter's death was "accidental." "Although not binding law, the Social Security Administration's Program Operations Manual System ("POMS") is persuasive authority." Buck v. Berryhill, 869 F.3d 1040, 1050–51 (9th Cir. 2017). "As an interpretation of a regulation promulgated by the Commissioner, the POMS control unless they are inconsistent with the regulation or plainly erroneous." Rodysill v. Colvin, 745 F.3d 947, 950 (8th Cir. 2014). That is, the statute and regulations control over the POMS, so this Court initially considers whether Harter's death was "accidental" as defined in the statutory and regulatory provisions.

Under 42 U.S.C. § 416(k), an accidental death is caused by "bodily injuries solely through violent, external, and accidental means and, as a direct result of the bodily injuries and independently of all other causes, [the insured] loses his life not later than three months after the day on which he receives such bodily injuries." Rinehart asserts that the administration of Vidaza caused Harter a bodily injury by suppressing his ability to ward off pneumonia and sepsis, thereby causing his death within weeks of when that chemotherapy drug was first administrated. Doc. 15 at 12, 15–22. Harter indeed died as a result of an infection contracted after Vidaza compromised his immunity system in an effort to treat Harter's blood cancer. But the language of § 416(k) requires, for there to be an exception to the nine-month marital requirement based on accidental death, the bodily injury be "solely through violent, external *and* accidental means." 42 U.S.C. §

416(k) (emphasis added). "External" is defined as bodily injury that "originated outside the body." POMS GN 00305.105(A)(3)(b)(1). "Violent" is defined as "force, however slight." POMS GN 00305.105(A)(3)(b)(2). The administration of the chemotherapy drug Vidaza under a physician's care seems to be "external," but the voluntary administration of chemotherapy under a doctor's care does not appear to be either "violent" or "accidental." See 42 U.S.C. § 416(k). The second ALJ did not cite the statute at all, but referenced the regulations and the POMS. So this Court next considers the regulations as applied to Rinehart's appeal.

Under the regulations, a death is accidental, such that there would be an exception to the nine-month marital duration requirement, if three requirements are met: (1) the death was "caused by an event that the insured did not expect," (2) the death was "the result of bodily injuries received from violent and external causes," and (3) "as a direct result of these injuries, death occurred not later than [three] months after the day on which the bodily injuries were received." 20 C.F.R. § 404.335(a)(2)(i). The conjunctive "and" links these three requirements, such that each must be satisfied for the death to qualify as "accidental."

As to the first subpart, if the administration of Vidaza is, as Rinehart argues, the event and cause of the bodily injury producing death, the event—that is, the administration of Vidaza—was one that Harter fully expected. No doubt, Harter expected that chemotherapy like Vidaza would extend his life expectancy and not hasten or lead to his death. No doubt, Harter did not expect to contract pneumonia and sepsis and die within weeks of receiving Vidaza. Rinehart phrases the key question on appeal as "Did Vidaza proximately cause Mr. Harter's death, that is, was it the initiating event in an unbroken chain of events leading to death?" Doc. 15 at 15. The proper inquiry under the first subpart of § 404.335(a)(2)(i), however, is whether the administration of

Vidaza was "an event that the insured did not expect." Plainly, Harter expected the event of the administration of Vidaza.

Under the second subpart of § 404.335(a)(2)(i), the bodily injury by way of the voluntarily administration of Vidaza might not be "violent" as discussed above, though it likely is "external." Both the statute and the regulation require both "violent" and "external" means of bodily injury. The second ALJ ultimately made no finding on this issue.

Under the third subpart of § 404.335(a)(2)(i), "as a direct result of these injuries," the death must occur within three months of "the day on which the bodily injuries were received." Harter underwent Vidaza infusions from March 5 to March 13, 2012, and died on April 20, 2012. Doc. 12-1 at 7, 43. Although there is no single "day on which bodily injuries were received," if Vidaza infusions could somehow be considered as "the event that the insured did not expect," then Harter died within three months thereof. However, this third subpart of the regulation requires more, and the "direct result of these injuries" requirement is discussed below in connection with the second ALJ's application of the POMS and factual findings.

Much of Rinehart's arguments on appeal focus not on the statute or regulation, but on the second ALJ's application of the POMS. There is some justification to criticizing how the ALJ applied the POMS, but that does not thereby entitle Rinehart to benefits. The ALJ sought guidance from the POMS, stating that "[a] death is 'accidental' if it was unforeseeable or unexpected." Doc. 12 at 18 (citing POMS GN 00305.105(A)(3)(b)(3)). However, the POMS actually state that "bodily injury," not the death, is "'accidental' if it was unforeseeable or unexpected." POMS GN 00305.105(A)(3)(b)(3)). The ALJ implied that the bodily injury may have been "unexpected" when she wrote, "[w]hile not the intended or expected outcome, there was a chance such complications could occur." Doc. 12 at 18. The ALJ then deemed the bodily injury not to be

15

"unforeseeable" in writing, "while it was not expected that Mr. Harter would develop complications ultimately contributing to his death, such complications were also not unforeseeable." Doc. 12 at 18. Based on a plain reading of the POMS, the bodily injury is accidental if it is unforeseeable *or* unexpected. POMS GN 00305.105(A)(3)(b)(3). The ALJ appears to have read a conjunctive into the POMS where a disjunctive exists. See POMS GN 00305.105(A)(3)(b)(3); Doc. 12 at 18.

Rinehart argues that the ALJ failed to properly apply the POMS by not considering whether the bodily injury was through violent and external means. Doc. 15 at 16–17. Rinehart claims that the Vidaza infusions were violent and external causes of bodily injury. Doc. 15 at 17. Rinehart is correct that the ALJ failed to address explicitly whether Harter sustained bodily injury that was "external" and "violent." See Doc. 12 at 18. However, the ALJ's lack of clear application of this part of the POMS does not justify reversal because, as explained above, the voluntary administration of the chemotherapy drug was not "an event the insured did not expect" under the statute or regulation and the ALJ based her decision on another reason for not applying the accidental death exception.

For the accidental death exception to apply, the statute requires that as a "direct result of the bodily injuries and independently of all other causes, [the insured] loses his life." 42 U.S.C. § 416(k). The regulation similarly requires for the accidental death exception that "as a direct result of these injuries, death occurred." 20 C.F.R. § 404.335(a)(2)(i). The ALJ, relying on the POMS, decided that she "cannot find that Mr. Harter's death was 'independent of all other causes.'" Doc. 12 at 17. The POMS guide the ALJ to analyze: "Did the deceased lose his/her life as a direct result of the accidental bodily injury . . . independent of all other causes? That is, did the deceased die

solely through violent, external, and accidental means?" POMS GN 00305.105(A)(3)(c). According to the POMS,

> A death certificate generally indicates the cause of death; i.e., natural, accidental, homicide, or suicide. However, entries on the death certificate are not necessarily controlling. Evidence may establish that the cause of death was misclassified or that the circumstances of the particular case justify a finding that the death was accidental.

POMS GN 00305.105(A)(2). Harter's death certificate lists the manner of death as "natural causes" and the cause of death as respiratory and kidney failure, sepsis, pneumonia, MDS, and atrial fibrillation. Doc. 12-1 at 43. The death certificate supports the ALJ's decision that Harter's death was not independent of his pre-existing MDS condition. The ALJ's decision in this regard is supported by substantial evidence in the record as a whole, thus making Rinehart ineligible for benefits. See Evans, 21 F.3d at 833.

To determine whether the death was independent of all other causes, 42 U.S.C. § 416(k), POMS state that the proximate or primary cause of death should be considered. POMS GN 00305.105(A)(3)(d). "The proximate or primary cause of death is either: (1) the direct cause of death; or (2) the initiating event in an unbroken chain of events, each causing the next, that leads to and ultimately causes death." POMS GN 00305.105(A)(3)(d).

Rinehart argues that the proximate cause of Harter's death was the Vidaza infusions under an "unbroken chain of events" theory. Doc. 15 at 18. She argues that "Harter experienced physical contact with a cause outside the body (i.e., infusions of Vidaza) resulting in injury that altered bodily function (destroyed bone marrow cells) and led in an unbroken chain of events to death." Doc. 15 at 18. Dr. Citron opined that "Vidaza was the initiating event in an unbroken chain of events each causing the next that led to and ultimately caused the death of Richard." Doc. 12-1 at 81. Dr. Parameswaran opined that the effect Vidaza had on Harter's body may have served as a

17

portal to initiate the serious chain of events . . . ." Doc. 12-1 at 97. Dr. Parameswaran also stated that "Vidaza was started in order to control the MDS." Doc. 12-1 at 95.

The ALJ did not consider the "unbroken chain of chain of events" argument, but instead turned to the more specific provision of the POMS for pre-existing conditions. Harter had pre-existing blood cancer that led to the Vidaza infusions as treatment. The POMS reads:

> Where a pre-existing disease exists, [the Commissioner] must decide which factor (the accidental injury or the pre-existing disease) was primarily responsible for causing death at the particular time that death occurred. A preexisting disease (or illness) does not, necessarily, preclude a finding that the accidental injury was the proximate cause of death.
>
> In deciding whether the injury or the disease is the proximate cause of death, SSA must determine which is the more substantial contributing factor. The injury is the proximate cause of death if the medical evidence "to a reasonable degree of certainty" shows that pre-existing conditions were under control at the time of the accident, even if they were active and capable of ultimately causing death. That is, the disease was not the direct or concurring cause of death.

POMS GN 00305.105(A)(3)(d). The ALJ found,

> Treatment notes, along with the responses of Dr. Citron and Dr. Parameswaran, suggest that sepsis was primarily responsible for causing Mr. Harter's death. However, it is again noted that this complication was neither unforeseen nor unexpected. Medical evidence does not show "to a reasonable degree of certainty" that Mr. Harter's pre-existing condition was under control. Dr. Parameswaran's progress notes indicate that Mr. Harter was advised to start Vidaza out of concern for further progression/development of illness. (Ex. 22 p. 166). He had previously informed Mr. Harter that "his disease will progress to leukemia if it is untreated." (Ex. 1). In his interrogatory responses, Dr. Parameswaran indicated that Mr. Harter's MDS was not "under control" at the time treatment with Vidaza was initiated. (Ex. 35, p. 2).

Doc. 12 at 18. The ALJ properly applied this section of the POMS to the facts of this case when concluding that Harter's condition was not under control at the time he was diagnosed with pneumonia/septicemia, so Harter's pre-existing condition was the proximate cause of death.

This Court may not reverse simply because it could have reached a different conclusion than the ALJ. Miller, 784 F.3d at 477. This Court must treat the Commissioner's findings that are

18

supported by substantial evidence as conclusive and may not reverse simply because there is an alternative conclusion. 42 U.S.C. § 405(g). Under 42 U.S.C. § 416(k), the bodily injury, independent of all other causes, must have caused the insured to lose his life. See also POMS GN 00305.105(A)(3)(c) ("Did the deceased lose his/her life as a direct result of the accidental bodily injury . . . independent of all other causes?"). This Court, applying the deferential review of substantial evidence on the record as a whole, cannot overturn the ALJ's conclusion that Harter's death was not independent from his pre-existing blood cancer. Moreover, under the statutory and regulatory provisions, what Rinehart contends to be the event and cause of Harter's death—voluntary Vidaza infusions to treat Harter's blood cancer—were not "an event the insured did not expect," 20 C.F.R. § 404.335(a)(2)(i), or "accidental" and possibly not "violent" either, see 42 U.S.C. § 416(k). Substantial evidence supports the ALJ's decision to deny Rinehart widow's insurance benefits.

**V.     Conclusion**

For the reasons explained above, it is hereby

ORDERED that the decision of the Commissioner is affirmed. It is further

ORDERED that Rinehart's Motion to Reverse Commissioner's Decision, Doc. 14, is denied.

DATED this 7th day of June, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE